**USX CORPORATION, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (Marshall), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Dec. 15, 2000.

Decided March 5, 2001.

Lori A. Tunstall, Philadelphia, for petitioner

Fred M. Feder, Philadelphia, for respondent.

Before McGINLEY, Judge, FRIEDMAN, Judge, MIRARCHI, Senior Judge.

FRIEDMAN, Judge.

USX Corporation (Employer) petitions for review of that portion of a May 30, 2000 order of the Workers' Compensation Appeal Board (WCAB) which affirmed the workers' compensation judge's (WCJ) order awarding Richard Marshall (Claimant) workers' compensation benefits for a 10.32% binaural hearing loss. We affirm.

Claimant filed a claim petition alleging that he sustained an occupational hearing loss as a result of long term exposure to

hazardous occupational noise and acoustic trauma.[1] (R.R. at 2a.) Employer filed an answer denying the allegations in Claimant's claim petition, and hearings were held before the WCJ.

At the hearings, Claimant testified on his own behalf. Claimant stated that he began working for Employer in 1964 and that this was the first job he held. (WCJ's Findings of Fact, No. 8.) Claimant testified he did not have any hearing problems when Employer first hired him. (WCJ's Findings of Fact, No. 8.) In fact, Claimant noted that, when Employer hired him in 1964, Employer gave him a hearing test and did not tell him that he had any problems with his hearing. (WCJ's Findings of Fact, No. 8.)

Claimant also testified with regard to his noise exposure while working for Employer. Claimant stated that, for approximately two years, he worked as a laborer in the "central shops." Claimant said that this was a noisy job because there were overhead cranes with sirens, big hammering machines, pipes clanging and a constant humming noise. (WCJ's Findings of Fact, No. 8.) Claimant testified that the next position he held with Employer for approximately ten years involved working on overhead cranes. (WCJ's Findings of Fact, No. 8.) Claimant stated that this job was constantly noisy because of noise from sirens, loud whistles from the locomotive and loud noises from hot riveting guns. (WCJ's Findings of Fact, No. 8.) Claimant stated that, although he wore ear protection while working this job, the ear protection was not effective in eliminating all the noise.

Claimant testified that, in his next position with Employer, he worked as a truck driver and was exposed to the same types of noises as before, although he wore ear protection which was somewhat effective in eliminating the noise. (WCJ's Findings of Fact, No. 8.) Claimant's next assignment with Employer was in a truck crane job for approximately ten years. Claimant testified there was constant noise on the job, and the ear protection he wore was somewhat effective in eliminating the noise. (WCJ's Findings of Fact, No. 8.) During his last few years with Employer, Claimant worked as a "wrapper" and ram operator, picking up and moving steel. (WCJ's Findings of Fact, No. 8.)

Claimant stated that Employer tested Claimant's hearing every year. Although Claimant was never given the results of his hearing tests, Employer sent him a note saying he had a problem with his hearing. (WCJ's Findings of Fact, No. 8.) However, Employer never told Claimant what percentage hearing impairment he might have. (WCJ's Findings of Fact, No. 8.) Claimant further testified that he was losing his hearing gradually over the course of his employment with Employer, but that since he retired from Employer in November of 1996, he has not noticed any progression of his hearing loss. (WCJ's Findings of Fact, No. 8.)

With regard to his other exposure to noise, Claimant testified that, from 1966 to 1967, he served in the Army in Vietnam but was not in combat, so his only exposure to gunfire consisted of basic training in the military, rifle shooting on the pistol range and deer hunting once a year. Claimant stated that he fires one to two times per day when he is deer hunting. (WCJ's Findings of Fact, No. 8.) Claimant further testified that he operates a circular

---

1. The claim petition listed the date of the injury as July 26, 1995; however, at a hearing, Claimant's counsel orally amended the date of the injury to November 30, 1996, which was Claimant's last day of work with Employer. (WCJ's Findings of Fact, No. 6; R.R. at 2a, 47a.)

saw, an electric drill and, occasionally, a chain saw. (WCJ's Findings of Fact, No. 9.) In addition, Claimant has a boat with a twenty horsepower motor, which he uses approximately once a week. (WCJ's Findings of Fact, No. 9.) Claimant's medical history and family history are non-contributory. (*See* WCJ's Findings of Fact, Nos. 9, 10.)

Claimant also offered a medical report from his treating physician, Steven Ladenheim, M.D., who is board-certified in otolaryngology. (WCJ's Findings of Fact, No. 10.) Dr. Ladenheim's report stated that he evaluated Claimant on November 24, 1997 and that Claimant reported having hearing difficulties and occasional tinnitus.[2] (WCJ's Findings of Fact, No. 10.) The report further stated that an audiogram[3] was performed on November 24, 1997, and it revealed a " 'moderate-to-severe' high frequency hearing loss with a small conductive component at 500 and 4000 Hz." (WCJ's Findings of Fact, No. 10; R.R. at 74a.) Based on the American Medical Association (AMA) Guide to the Evaluation of Permanent Impairment, Fourth Edition (Impairment Guide), Dr. Ladenheim opined that Claimant has a binaural hearing impairment of 10.32%, which is permanent and irreversible. (WCJ's Findings of Fact, No. 10; R.R. at 74a.) Dr. Ladenheim further opined that the sensorineural component of Claimant's hearing loss resulted from his high levels of noise exposure while employed with Employer. (WCJ's Findings of Fact, No. 10; R.R. at 74a.)

For its part, Employer presented reports of Lee Rowe, M.D., who is board-certified in otolaryngology. (WCJ's Findings of Fact, No. 13.) In a report dated May 27, 1998, Dr. Rowe stated that he evaluated Claimant on April 27, 1998 and that Claimant complained of occasional tinnitus. (WCJ's Findings of Fact, No. 14.) Dr. Rowe noted that Claimant's physical examination revealed mild to moderate tympanosclerosis.[4] (WCJ's Findings of Fact, No. 14.) Dr. Rowe also stated that audiometric testing revealed evidence of a mild to moderate conductive hearing loss bilaterally in the low frequencies, left greater than right, and a high frequency conductive component in both ears as well. (WCJ's Findings of Fact, No. 14; R.R. at 77a.) Dr. Rowe noted a mild mid-frequency sensorineural hearing loss with a severe mixed conductive sensorineural hearing loss in the high frequencies. (WCJ's Findings of Fact, No. 14; R.R. at 77a.)

Dr. Rowe also reviewed the audiometric data from Employer from 1967 through 1995 and noted evidence of mild to moderate high frequency hearing loss as early as 1967. (WCJ's Findings of Fact, No. 14; R.R. at 78a.) Dr. Rowe further noted progressive hearing loss, which he indicated was consistent with a combination of aging and noise induced hearing loss. (WCJ's Findings of Fact, No. 14; R.R. at 78a.) Dr. Rowe opined that Claimant's sensorineural hearing loss was due to a combination of occupational and non-occupational noise as well as aging. (WCJ's Findings of Fact, No. 14; R.R. at 78a.) Dr. Rowe also opined that Claimant's con-

---

2. Tinnitus is defined as noises, such as ringing, whistling, booming, etc. in the ears. STEDMAN'S MEDICAL DICTIONARY 1603 (25th ed.1990).

3. The audiogram conformed to OSHA Occupational Noise Exposure Standards. (WCJ's Findings of Fact, No. 10.)

4. Tympanosclerosis is a "condition characterized by the presence of masses of hard, dense connective tissue around the auditory ossicles in the tympanic cavity." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1767 (28th ed.1994).

ductive hearing loss was secondary to tympanosclerosis, which was observed at Claimant's physical examination. (WCJ's Findings of Fact, No. 14; R.R. at 78a.)

Dr. Rowe stated that, because "the effects of noise and age are simultaneously accruing ... it is necessary to estimate the relative contributions of age-related hearing loss and noise induced hearing loss to [Claimant's] overall hearing loss." (R.R. at 79a; *see* WCJ's Findings of Fact, No. 14.) Accordingly, Dr. Rowe stated that the International Organization for Standardization Report ISO–1999 (1990) provides a data set to estimate the puretone thresholds and that by "working backwards from an individual with known hearing levels to age, gender and noise exposure a best estimate of the relative contributions of age and noise to the individual's hearing loss can be obtained."[5] (R.R. at 79a; *see* WCJ's Findings of Fact, No. 14.) Using the AMA Impairment Guide, and using "bone conductive thresholds" to eliminate the contribution of the conductive loss in the low frequencies, Dr. Rowe opined that Claimant has an overall binaural hearing impairment of 1.9%. (WCJ's Findings of Fact, No. 14; R.R. at 78a.) Based on Claimant's binaural hearing impairment of 1.9%, Dr. Rowe concluded that it "is more probable than not than [sic] more than 50% of [Claimant's] binaural hearing handicap is attributable to aging and not due to noise exposure ...." (R.R. at 80a; *see* WCJ's Findings of Fact, No. 14.) In explaining the difference between Dr. Ladenheim's and his own computation of Claimant's hearing loss, Dr.

Rowe noted that Dr. Ladenheim used air thresholds and not bone thresholds, which Dr. Rowe stated should be used when computing a sensorineural hearing loss. (WCJ's Findings of Fact, No. 14; R.R. at 78a.)

The WCJ accepted Claimant's testimony as credible. (WCJ's Findings of Fact, No. 16.) The WCJ also accepted the opinions of Dr. Ladenheim as persuasive, competent and unequivocal. (WCJ's Findings of Fact, No. 17.) On the other hand, the WCJ rejected Dr. Rowe's opinion as incompetent, equivocal and unpersuasive.[6] (WCJ's Findings of Fact, No. 18.) Accordingly, the WCJ concluded that Claimant met his burden of proving that he sustained a work-related, permanent and irreversible 10.32% hearing impairment, and the WCJ awarded Claimant benefits. (WCJ's Conclusions of Law, Nos. 3–5).

Employer appealed to the WCAB, which affirmed. Employer now petitions this court for review of the WCAB's order,[7] arguing that the WCAB and WCJ erred in concluding that Employer is liable for that portion of Claimant's hearing loss which is unrelated to Claimant's employment with Employer.

Employer relies on a single statement in Dr. Ladenheim's report that Claimant's audiogram "reveals a moderate-to-severe high frequency sensorineural hearing loss with a small conductive component at 500 and 4000 Hz." (R.R. at 74a.) Employer points out that, in this statement, Dr. Ladenheim links only the *sensorineural* com-

---

5. Because of Claimant's involvement in hunting, Dr. Rowe used database "B." (R.R. at 79a; WCJ's Findings of Fact, No. 14.)

6. The WCJ stated that, notwithstanding Dr. Rowe's improper utilization of the ISO 1999, his reliance on its "statistical estimates" mandates the rejection of his opinion as incompetent and equivocal. (WCJ's op. at 20.)

7. Our scope of review is limited to determining whether an error of law was committed, whether constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

ponent of Claimant's hearing loss to Claimant's work duties. Employer contends that once the conductive component is subtracted from Claimant's binaural hearing impairment of 10.32% as calculated by Dr. Ladenheim, Claimant's hearing loss falls below a ten percent impairment,[8] and, thus, Claimant is not entitled to benefits.[9] Therefore, Employer argues that, regardless of which medical expert was found credible, the record does not contain substantial evidence to sustain Claimant's burden of proof. We disagree.

Employer assumes that the percentage of Claimant's hearing loss is based on a portion that is attributable to a conductive component. However, Employer offered no evidence to prove this assumption. In fact, upon reviewing the measurements from the audiogram, as charted on the audiological evaluation, and using the binaural hearing impairment formula in the Impairment Guide, we note that Dr. Ladenheim used only the sensorineural measurements to calculate Claimant's hearing impairment. (R.R. at 75a.) Further, we note that the manner in which Dr. Ladenheim calculated Claimant's hearing loss complied with the requirements of the Act.[10] *See* 77 P.S. 513(8)(i) and (iv). In urging this court to deduct some figure from Claimant's percentage hearing impairment, Employer is simply creating its own formula, taking a position inconsistent with the evidence [11] and imposing a standard inconsistent with the law.

Because Dr. Ladenheim's credible opinion provides substantial evidence to support the WCJ's finding that Claimant sustained a 10.32% work-related, permanent hearing loss, we affirm.

## *ORDER*

AND NOW, this 5th day of March, 2001, the order of the Workers' Compensation Appeal Board, dated May 30, 2000, at A99 1605, is hereby affirmed.

---

**8.** Employer asserts that Claimant's binaural hearing handicap is 0%. (Employer's brief at 11.)

**9.** Section 306(c) of the Workers' Compensation Act provides that no benefits shall be payable if the level of hearing impairment calculated under the AMA Impairment Guide is equal to or less than ten percent. Act of June 2, 1915, P.L. 736, *added by* Act of February 22, 1995, P.L. 1, *as amended,* 77 P.S. § 513(8)(iii).

**10.** The audiogram complied with OSHA standards, and Dr. Ladenheim calculated Claimant's percentage of hearing loss in accordance with the Impairment Guide.

**11.** Interestingly, we note that even Dr. Rowe's opinions, which the WCJ rejected, do not support the calculations that Employer advances.